THE SALISBURY WATER SUPPLY COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES.
(and two companion cases[1]).

Suffolk.    May 11, 1962. — July 9, 1962.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & SPIEGEL, JJ.

*Public Utilities.    Water Company.    State Administrative Procedure Act.*

A decision by the Department of Public Utilities disallowing a rate schedule filed by a small operating water company wholly owned by another corporation must be annulled on review under G. L. c. 25, § 5, where the record contained no "substantial evidence" supporting the decision within §§ 1 (6), 14 (8) (e), of the State administrative procedure act, G. L. c. 30A, nor any statement of the reasons for the decision as required by § 11 (8) of c. 30A.    [718–719]

---

[1] The companion cases are by The Oxford Water Company and by Massachusetts Water Works Company against the same defendant.

That the Department of Public Utilities, in making a decision disallowing a rate schedule filed by a water company, might reject the testimony of the company's expert and might be entitled, as it stated in its decision it was, "to use its expertise" could not supply in the record on judicial review "substantial evidence" supporting the decision within § 14 (8) (e) of the State administrative procedure act, G. L. c. 30A. [721]

PETITIONS filed in the Supreme Judicial Court for the county of Suffolk on April 18, 1961, and August 18, 1961.

The cases were reserved and reported by *Whittemore,* J.

*Edward B. Hanify* (*Lane McGovern* with him) for the plaintiffs.

*John J. Coffey,* Assistant Attorney General, for the defendant.

WILKINS, C.J. These are appeals by three water companies under G. L. c. 25, § 5 (as amended through St. 1956, c. 190), to review orders of the department, which disallowed schedules of increased rates and charges filed by the respective companies.[1] The cases are reserved and reported without decision by the single justice.

In each case the department, acting on its own motion, suspended the operation of the schedules for ten months beyond the time when the rates and charges would otherwise have become effective, the maximum period permissible under G. L. c. 165, § 2; c. 164, § 94 (as amended through St. 1948, c. 471), and conducted an investigation as to their propriety. At the conclusion of the investigations each company was allowed to file new schedules of lesser rates than those which were disallowed. These were filed with an express reservation of the right to appeal. See *Department of Pub. Util.* v. *New England Tel. & Tel. Co.* 325 Mass. 281, 291–292.

The principal issue raised by each company is whether the return allowed by the department is sufficient not only to cover the utility's operating expenses, taxes, and depreciation but also to "maintain financial integrity, attract

---

[1] These schedules were filed as follows: By the Salisbury Water Supply Company on August 26, 1960. By The Oxford Water Company and by Massachusetts Water Works Company on April 26, 1961.

capital, and compensate investors for the risks assumed.''
*New England Tel. & Tel. Co.* v. *Department of Pub. Util.*
331 Mass. 604, 617. Each makes the contention, among
others, that the record does not contain ''substantial evi-
dence'' upon which the department could have based its
findings, as required by the State Administrative Procedure
Act. G. L. c. 30A, §§ 1 (6), 14 (8) (e). *Newton* v. *Depart-
ment of Pub. Util.* 339 Mass. 535, 548. *Fortier* v. *Depart-
ment of Pub. Util.* 342 Mass. 728, 734–735. Compare G. L.
c. 30A, § 14 (8) (f); *Lowell Gas Co.* v. *Department of Pub.
Util.* 324 Mass. 80, 86–87; *New England Tel. & Tel. Co.* v.
*Department of Pub. Util.* 327 Mass. 81, 85.

'' 'Substantial evidence' means such evidence as a reason-
able mind might accept as adequate to support a conclu-
sion.'' G. L. c. 30A, § 1 (6). *Sinclair* v. *Director of the
Div. of Employment Security,* 331 Mass. 101, 102. *Nor-
wood Ice Co.* v. *Milk Control Commn.* 338 Mass. 435, 441.
*Singer Sewing Mach. Co.* v. *Assessors of Boston,* 341 Mass.
513, 517. *McCarthy* v. *Contributory Retirement Appeal
Bd.* 342 Mass. 45, 47, note 2.

The hearings before the department were ''adjudicatory
proceedings'' under G. L. c. 30A, § 1 (1). *Newton* v. *De-
partment of Pub. Util.* 339 Mass. 535, 542. ''Every agency
decision shall be in writing or stated in the record. The
decision shall be accompanied by a statement of reasons
for the decision, including determination of each issue of
fact or law necessary to the decision . . . .'' G. L. c. 30A,
§ 11 (8). One of the duties of judicial review is to deter-
mine ''upon consideration of the entire record'' whether
substantial rights have been prejudiced because the agency
decision was ''unsupported by substantial evidence.'' G. L.
c. 30A, § 14 (8). *Norwood Ice Co.* v. *Milk Control Commn.*
338 Mass. 435, 441. *Bay State Harness Horse Racing &
Breeding Assn. Inc.* v. *State Racing Commn.* 342 Mass.
694, 701.

The plaintiffs are small operating water companies, the
common stock of which is wholly owned by Greenwich
Water System, Inc., which is a subsidiary of American

Water Works Company, Inc. The Salisbury Water Supply Company (Salisbury) provides service in Salisbury for 2,408 customers, 1,732 of whom are seasonal. This was the first general increase in rates and charges requested by the company since it began operations in 1915. The Oxford Water Company (Oxford) serves approximately 1,680 customers in Oxford. Massachusetts Water Works Company (Millbury) serves approximately 1,625 customers in Millbury.

A detailed analysis of the finances of the three companies cannot be set forth in a judicial opinion of reasonable length. Nor is such a course necessary at this time, because we are of opinion that the decisions of the department are open to the objections urged by the companies that there are a lack of substantial evidence and an absence of reasons for the decisions.

The department granted each company's requests for rulings numbered 11, 12, and 13: The eleventh request was that the company "is entitled to a fair return on its net investment in property used or useful in fulfilling its obligations to provide the general public with adequate . . . service." "12. A fair return is one which is sufficient to insure confidence in the financial soundness of the utility, adequate to maintain and support its credit, sufficient to enable it to attract the capital required to meet its public obligations and commensurate with that generally being earned on investments in business undertakings attended by corresponding risks. 13. The rate of return employed for testing the reasonableness of rates must be such that the utility has a reasonable chance actually to earn a fair return in the foreseeable future, taking into account the continued necessity, if any, of making plant additions and replacements at higher unit costs, and the general tendency of the return to erode under the impact of inflation on operating expenses."

At the hearings the companies introduced evidence to show that in order for them to provide a fair return on their equity and debt capital, rearranged in proportions

beneficial to the company (G. L. c. 165, § 2, c. 164, § 13), they should increase their rates to produce annual gross revenues of substantially higher percentages. Salisbury sought a revenue increase of $31,178, or 32%; Oxford $52,310, or 76.3%; and Millbury $35,087, or 30.7%.

The companies called as a witness an expert in the field of public utility financing whose qualifications were unquestioned. He estimated that the cost of common stock to these companies, considering their smallness and the risk, and exclusive of financing expenses, would be 11%; and that the cost of debt capital would be for Salisbury 6.25%, for Oxford 5.88%, and for Millbury 5.88%. Based on the expert's estimates of cost of capital, the companies computed the respective amounts of increase they sought as follows: (1) Salisbury — on a rate base of $485,167.79 to provide a return of 7.73%[1] — $37,524. (2) Oxford — on a rate base of $399,276.70 to provide a return of 7.74%[1] — $30,893. (3) Millbury — on a rate base of $496,860.67 to provide a return of 7.94%[1] — $39,433.

No evidence was offered by the department or any town in any of the cases. The department accepted the rate basis used by Salisbury, and reduced the rate bases used by Oxford and Millbury to $382,430 and $489,460, respectively. It allowed as rates of return: Salisbury 6.5%; Oxford 6%; and Millbury 6%. The decisions of the department fail completely to give any reasons and do not, and cannot, refer to evidence in the record which might fairly support its conclusions.

In the case of Salisbury the substance of the unanimous decision of the department may fairly be said to consist of two sentences in a single paragraph: "The department is of the opinion that an overall rate of return of 6.5% is sufficient to enable this company which has a high proportion of seasonal customers to attract the necessary additional capital required in the immediate future. We are, therefore, providing in our order that the company refile with the department rates that will produce annual net operating income of approximately $31,536."

---

[1] Percentage rates of return are carried out to the nearest hundredth.

In the Oxford and Millbury cases, with two commissioners dissenting, there were somewhat longer opinions. These, however, do not contain an adequate statement of reasons, and the findings lack substantial support in the evidence. In both cases there appears the following paragraph, "The term 'cost' of equity, as used in testimony of the company's expert is a term of art and cannot be equated with its use in connection with fixed interest bearing securities. The very nature of equity securities is that they have no cost in the ordinary sense, and judgments as to the so called cost of equity is nothing more than an attempt to estimate what equity investors in the company should receive in the light of the returns which investors are receiving on investments of comparable risk and growth possibilities. So viewed, the judgment is based on numerous uncertainties and is complicated in the present case by the fact that there is no market for the company's equity securities other than the parent company. In the light of these circumstances, we believe that the department, although it may give weight to the conclusions of the company's witness, cannot be bound by his judgments. On the contrary, the department itself has considerable experience in determining rates of return and is entitled to use its expertise in any given case."

It may be conceded that the department is not bound by the testimony of the companies' expert, but nonacceptance of testimony does not create substantial evidence to the contrary. The reference to "expertise" gives some clue to the action of the department, but its expert skill, however great, cannot beget power to substitute undisclosed evidence. Its authority in this respect is clearly set forth in G. L. c. 30A, § 11 (5), which reads: "Agencies may take notice of any fact which may be judicially noticed by the courts, and in addition, may take notice of general, technical or scientific facts within their specialized knowledge. Parties shall be notified of the material so noticed, and they shall be afforded an opportunity to contest the facts so noticed. Agencies may utilize their experience, technical

competence, and specialized knowledge in the evaluation of the evidence presented to them.''

''A finding without evidence is arbitrary and baseless.'' *American Employers' Ins. Co.* v. *Commissioner of Ins.* 298 Mass. 161, 167. *Morgan* v. *United States,* 298 U. S. 468, 480. This rule has been applied to a variety of situations. *Graves* v. *School Comm. of Wellesley,* 299 Mass. 80, 87. *Higgins* v. *License Commrs. of Quincy,* 308 Mass. 142, 148. *Boott Mills* v. *Board of Conciliation & Arbitration,* 311 Mass. 223, 227. *Moran* v. *School Comm. of Littleton,* 317 Mass. 591, 594.

The decision as to Oxford contained the following: ''We conclude that a return in excess of 6 per cent for this company, which is a wholly-owned subsidiary of a substantial holding company, would be unreasonable. [This return will permit the company to earn approximately 6½ per cent on its equity, and to pay dividends of 5.2 per cent to its stockholders at an 80 per cent payout ratio.] In making this judgment, we are influenced by the fact that the demand for the services of water companies is typically more stable than that of telephone, gas and even electric companies and, that a water company does not need the protection against the possibility of adverse economic conditions to the same extent as do other utilities.''

Not only is substantial evidence lacking to support the comparison of water companies with other companies, but the reference to the parent company has fallacious implications as are pointed out by the dissenting commissioners, who say, ''The rate of return allowed the Company is not sufficient 'to maintain its credit and to obtain additional capital when needed to [enable it to] serve its public.' *New England Telephone and Telegraph Co.* v. *D.P.U.* 327 Mass. 81, [94]. The fact that the parent company owns all the outstanding common stock is no guaranty that it will continue to invest in this company. Quite apart from the fact that an inadequate return on equity already invested in the company is unfair, if the return which we allow on equity is not comparable to the return which the parent can

earn elsewhere, it is to be expected that the parent will prefer to invest elsewhere rather than to provide additional capital needed by this company for expansion. We believe that a return on equity of 8% should be allowed. In order to obtain this return with a composite debt cost of 5.51%, the company should be allowed an overall return of 6.76%.''

In the Millbury decision the quoted paragraph from the majority appears with the second sentence, which is shown in brackets, omitted.[1] The statement of the dissenting commissioners is identical except for the last sentence, which reads, ''In order to obtain this return with a debt cost of 5.88% . . ., the company should be allowed an overall return of 6.72%.''

A final decree is to be entered in each case annulling the order of the department. The cases are recommitted to the department for further proceedings in accordance with this opinion.

*So ordered.*

---

[1] There is an unsubstantial variation in the first sentence.